**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Valerie L. Hansen,

Plaintiff,

v.

Genuine Parts Company, NAPA Distribution Center,

Defendant.

Civil No. 00-16 (DWF/AJB)

**MEMORANDUM OPINION AND ORDER**

---

Philip Mahowald, Esq., Winthrop & Weinstine, 60 South Sixth Street, Suite 3000, Minneapolis, MN 55402-4430, appeared on behalf of Plaintiff.

Elizabeth Csehy, Esq., Martenson Law Firm, 100 Galleria Parkway Northwest, Atlanta, GA 30339, appeared on behalf of Defendant.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on May 23, 2001, pursuant to Defendant's motion for summary judgment. In the Complaint, Plaintiff alleges sexual harassment and retaliation in violation of Title VII and the Minnesota Human Rights Act ("MHRA"). For the reasons set forth below, Defendant's motion is denied.

MAY 29 2001
FILED
FRANCIS ... L CLERK
JUDGMENT ENT...
DEPUTY CLERK

## Background[1]

Plaintiff Valerie Hansen ("Hansen")[2] worked for Defendant Genuine Parts Company ("GPC") from September 11, 1989 to December 5, 1998, most recently as a "will call" clerk at GPC's Distribution Center in Owatonna, Minnesota. From sometime in 1995 until her termination, Hansen's immediate supervisor at GPC was Jack Anderson ("Anderson"). (Deposition of Jack Anderson ("Anderson Depo.") at pp. 6-7.)

Hansen's claims for sexual harassment are based, apparently exclusively, on allegations about the behavior of Anderson. Sometime in mid-1997, Anderson showed Hansen pornographic magazines he kept in his desk at work and described their contents to her. (Deposition of Valerie Klingfus f/k/a Valerie Hansen ("Plaintiff Depo.") at pp. 123-124; Aff. of Philip Mahowald, Ex. D ("Hearing Tr.") at VLH00290-91.) Starting sometime in mid-1997, Anderson repeatedly told Hansen about the women he met in bars, describing their physical attributes in a sexual way. (Plaintiff Depo. at pp. 125-126.) In December of 1997, Anderson directed Hansen to distribute a promotional flyer with the phrase "Freon Blitz (from The Tits)." (Plaintiff Depo. at 135-137.) Also in December of 1997, Anderson allegedly reached for Hansen's breasts; Hansen dodged his advance, but alleges that Anderson did brush one of her breasts with his hand. (Plaintiff Depo. at 127.)

---

[1] For purposes of this motion and order, the Court articulates the facts in the light most favorable to the Plaintiff. Many of the facts described below are in dispute.

[2] The Plaintiff has remarried since the onset of litigation. Her legal name is now Valerie Klingfus. To avoid confusion, however, the Court will refer to the Plaintiff by the name she used at the time of the events in question and the name which is listed in the official caption of the case: Valerie Hansen.

On several occasions throughout 1998, Anderson would drive past Hansen's house on the way to his own; Anderson admits that he might have driven past Hansen's house, but contends that it was on one of his regular routes home. Hansen alleges, however, that Anderson went out of his way to drive past her house and that he would make comments the following day about seeing her standing in her living room window or about various cars parked in her driveway. (Plaintiff Depo. at 158-159.)

Hansen alleges that she repeatedly told Anderson that these actions and remarks were offensive to her. She admits, however, that she did not report any of these events to other management at the time they occurred.

In April of 1998, Hansen alleges that Anderson answered a telephone call from a customer who asked for Hansen. Anderson asked the customer if the customer wanted to talk to "the whore" and offered to put "the whore" on the phone. Hansen did complain about this incident to Robert Thomley ("Thomley"), GPC's General Manager. According to Hansen, she told Thomley that she "just could not tolerate [Anderson's] behavior anymore." (Plaintiff Depo. at 155.) Thomley told Hansen that he would investigate the matter and let Hansen know what happened. It is unclear from the record whether either Thomley or James Arpin ("Arpin"), then the Director of Personnel at the Owatonna GPC facility, actually spoke with Anderson about Hansen's allegations. Regardless, neither man ever told Hansen about any investigation or followed up with her in any way.[3]

---

[3] GPC now alleges that Hansen has testified to being satisfied with GPC's investigation. This allegation misstates the record. Hansen testified that, at the time Thomley promised to investigate and follow up, she was satisfied with his response. Nothing in the record suggests that Hansen was satisfied with GPC's failure to abide by that promise.

In June of 1998, Hansen made two complaints to GPC's toll-free employee assistance number. Both complaints involved alleged improprieties by Anderson; in one of those complaints, Hansen reported the "whore" incident.[4] (Plaintiff Depo. at 169.) In that same complaint, Hansen notified the hotline that she thought Anderson was trying to get her fired. (*Id.*) Hansen made a total of at least 14 calls to the employee assistance hotline during the summer of 1998 (the two original complaints and a number of calls to follow up on those complaints). On each occasion, she was told that the company had no response for her.

Meanwhile, according to Hansen, Anderson continued to harass her. Sometime during the summer of 1998, Anderson asked Hansen to return several pornographic movies; Anderson described the content of those pornographic movies to Hansen. (Plaintiff Depo. at 151-52.) During July of 1998, Anderson told a customer on the phone that Hansen would handle the customer's order soon but that, at the time, Hansen was doing something "incredible" to Anderson that the customer would not believe. (Plaintiff Depo. at 132-33.) Hansen admits that she did not report these additional incidents to management.

Hansen did, however, apparently undertake an investigation of her own. Hansen asked several customers whether Anderson had said anything negative about Hansen or other women working for GPC. The record indicates that Jim Arpin and Jack Anderson were aware that

---

[4] Although the internal GPC log of these calls does not mention Hansen's allegations of sexual harassment, Thomley testified before a Representative of the Commissioner of the Minnesota Department of Economic Security that he was aware that an employee had called the toll-free number to lodge a sexual harassment complaint against Anderson. (Hearing Tr. at VLH00340.) The admissibility of the hearing transcript has been challenged by GPC. Although the Court is inclined to find the transcript is admissible, at least for impeachment purposes, the Court's decision is not dictated by the contents of that transcript. Even without the transcript, the Court would have reached the same decision regarding GPC's motion for summary judgment.

Hansen had contacted several customers with these inquiries; in notes dated July 22, 24 and 28, Jim Arpin reports calls from Hansen to various customers in which Hansen was "trying to dig up dirt on Jack [Anderson]." (Mahowald Aff., Exhibits L, M, and N.) Indeed, Jack Arpin's notes state that his "personal opinion is we can't have an employee calling our customers trying to dig up dirt on her manager. That is wrong. It makes us look bad. Our customers don't need to know of any internal strife that may be occurring." (Mahowald Aff., Ex. M.)

On August 24, 1998, Anderson again tried to reach for Hansen's breasts; she again stepped aside and told Anderson that such advances were not welcome. (Plaintiff's Depo. at 160.) Shortly thereafter, Hansen was called in for a meeting regarding her misuse of the employee discount program, her use of the phone for personal calls, and her inquiries into Anderson's behavior. Hansen was suspended, effective immediately.

Hansen alleges that shortly after she got home she called her physician about the stress and strain of her employment situation; the physician prescribed Xanax. Hansen took the medication right away. Hansen alleges that someone from GPC called her that afternoon to explain that she was not fired and to ask her to come in to work. Hansen could not work that day because she was drowsy from the medication and could not drive. The next day, her physician placed her on medical leave; Hansen alleges that she was placed on leave because of anxiety related to the sexual harassment. Hansen never returned to work, resigning in December of 1998.

On September 1 and September 10 of 1998, Hansen wrote letters to Robert Thomley. (Mahowald Aff., Exhibits I and J.) In those letters, Hansen describes the "whore" incident, the incident in which Anderson told a customer that Hansen was doing something "incredible" to him, and Anderson's attempt to grab Hansen's breasts on August 24; the letters also indicate that

Hansen tried to prompt an investigation through use of the employee hotline. In conclusion, Hansen stated that she would not accept any phone calls from GPC. From the record before the Court, GPC never attempted to investigate Hansen's allegations, and GPC never contacted Hansen.[5]

Hansen filed a charge with the Minnesota Department of Human Rights on October 28, 1998, alleging "aiding and abetting" sexual harassment. In point of fact, however, the factual allegations state that Hansen was "subjected to sexual harassment" and that the Respondent (Jack Anderson of GPC) subjected Hansen to sexual harassment. Hansen filed a charge with the EEOC on December 30, 1998, alleging sexual harassment, constructive discharge ("Due to the torment I have been forced to resign."), and retaliation (specifically with reference to Hansen's calls to customers inquiring about Jack Anderson's behavior).

**Discussion**

**1. Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral

---

[5] GPC makes several references to the closing lines of Hansen's letter, stating that Hansen told GPC not to contact her. This is also a misstatement of the record. Hansen told GPC not to contact her by telephone; her mention of a caller i.d. makes that abundantly clear. Hansen never told GPC that they could not write to her. Indeed, responding in writing would have been a more appropriate course to take had GPC chosen to respond at all.

part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Fed. R. Civ. P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

**2. Sexual Harassment Claim**

GPC first argues that Hansen has failed to establish a prima facie case of sexual harassment because she has failed to establish that the alleged offensive conduct was unwelcome and because she has failed to establish that the conduct was sufficiently severe and pervasive enough to alter a term or condition of her employment. The Court finds that Hansen has met her burden by raising sufficient factual questions to go to a jury.

The record, viewed in the light most favorable to Hansen, indicates that Hansen repeatedly told Anderson, her immediate supervisor, that his behavior was unwelcome. Moreover, in April of 1998, Hansen spoke with Anderson's superior about her concerns. According to the record, Hansen told Thomley about the "whore" incident and that she "just could not tolerate [Anderson's] behavior anymore." Hansen made a specific complaint about only one incident, but she also made it clear that that incident was the culmination of a pattern of offensive behavior; a fact-finder could conclude that Thomley should have been on notice that

the "whore" incident was something more than a single, isolated remark. Finally, the record supports a conclusion that Hansen continued to voice her concerns through the employee hotline, calling over two months after her complaint to Thomley. Again, a reasonable fact-finder could conclude that Thomley and GPC were on notice that neither the "whore" incident specifically nor Anderson's pattern of behavior more generally had been resolved.

It is true that Hansen admits that she did not continue to make complaints about specific instances of harassment. However, the Court is loathe to find that Hansen had an obligation to continue the futile exercise of complaining to GPC's management and getting no response. The record indicates that Hansen took advantage of the recourse suggested in the employee manual by speaking with her supervisor, the manager, and the employee hotline–all to no avail. In fact, the record suggests that, by the time Hansen spoke with the employee hotline, she was concerned about retaliation. Whether her failure to report additional specific incidents was reasonable and whether her reports of harassment were sufficient to place GPC on notice of Anderson's broader course of conduct are questions of fact for a jury to resolve.

Finally, the Court notes that Hansen *did* complain of additional specific incidents after she went on medical leave. At the time Hansen wrote her two lengthy letters to Thomley, both GPC and Hansen believed that Hansen would be returning to work. In light of Hansen's previous complaints, her anticipated return to work, and her suggestion that the harassment was one factor *preventing* her from returning to work, a jury could conclude that GPC's complete failure to respond to these allegations was unreasonable.

Similarly, the Court finds that there is a genuine issue of material fact regarding whether the alleged conduct was sufficiently severe and pervasive so as to alter a term or condition of Hansen's employment. The record indicates that Hansen was quite distraught by Anderson's

behavior, losing interest in her job entirely. Ultimately, according to Hansen, the harassment situation forced her to take medical leave, to be placed on medication for anxiety, and finally to resign her position. Again, whether this was a reasonable response is a question for a jury, but Hansen has raised a genuine issue of material fact.

GPC further suggests that it should be shielded from liability on the basis of the so-called Faragher/Ellerth affirmative defense. That defense shields an employer from liability only if the employer can demonstrate "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). Once again, there are genuine issues of material fact which preclude summary judgment on the basis of this defense.

**3. Retaliation**

Hansen's EEOC charge states that she "was advised that contacting coworkers about the behavior of Jack Anderson during working hours was inappropriate . . . ." GPC's own internal documentation suggests that GPC management was particularly concerned about Hansen questioning clients about Anderson's treatment of women generally and Hansen specifically, and that GPC intended to discipline Hansen for such investigation. Investigating sexual harassment is a protected activity under Title VII. At a minimum, there is a question of fact on the issue of whether Hansen engaged in protected activity.

**4. Conclusion**

Credibility is the lynchpin of this case. If a jury wholeheartedly adopts Hansen's description and characterization of the events, this is virtually a textbook example of sexual

harassment: a supervisor who calls his employee a "whore" and "The Tits," intimates to others that she provides him with sexual favors, shows and describes pornography to her, tells others she is incompetent, stalks her home, and attempts–more than once–to touch her breasts. If a jury wholeheartedly adopts Hansen's description and characterization of events, she went directly to Anderson's superior and to an employee hotline, but, in both cases, received absolutely no response . . . so she gave up and began taking proactive measures herself. If a jury wholeheartedly adopts Hansen's description and characterization of events, her employer became concerned that she was trying to "dig up dirt" on her supervisor and began building a case against her to support her discharge by selectively enforcing company policy against her. If a jury wholeheartedly adopts Hansen's description and characterization of events, a jury will likely find in her favor on both her harassment and retaliation claims.

GPC's motion today essentially asks the Court to look beyond Hansen's description and characterization of events, to find that Hansen is not entirely credible. Perhaps a jury will agree with GPC, but such a determination is far beyond the reach of a motion for summary judgment.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. No. 41) is **DENIED**.

Dated: May 29th, 2001

DONOVAN W. FRANK
Judge of United States District Court